HANMER, Plaintiff-Appellant, v. DEPARTMENT OF INDUS-
TRY LABOR & HUMAN RELATIONS, and another,
Defendants-Respondents.
GRIEP, Plaintiff-Appellant, v. DEPARTMENT OF INDUSTRY,
LABOR & HUMAN RELATIONS, and another, Defend-
ants-Respondents.

Supreme Court

*No. 77–029. Submitted on briefs September 12, 1979.—
Decided November 6, 1979.*
(Also reported in 284 N.W.2d 587.)

For the appellants the cause was submitted on the brief of *R Arthur Ludwig* and *Ludwig & Shlimovitz, S.C.*, of Milwaukee.

For the respondents the cause was submitted on the brief of *Uclair W. Brandt*, director, and *James L. Pflasterer*, attorney, Job Service Division.

BEILFUSS, C.J. The claimants-appellants were both employed by and each owned 50 percent of the stock of Prestige Furniture, Inc. They also served as officers of the corporation: Hanmer as president and Griep as secretary-treasurer. Prestige Furniture, Inc., was a retail furniture store located in the City of Fort Atkinson, Wisconsin. All decisions affecting the business were made jointly by the appellants. From the corporation's inception in October of 1970, they were the only employees of Prestige Furniture and performed regular services for the corporation six days a week for a salary of $275 per week.

In the first two years of its existence Prestige Furniture, Inc., operated at a profit. It began experiencing financial difficulty in 1973 as a result of a substantial increase in competition and an economic recession. In each of its last three years the business suffered a progressively greater loss. On October 13, 1975, on the advice of their attorney, appellants filed a voluntary petition for bankruptcy.

Appellants testified before the hearing examiner that just prior to their decision to file for bankruptcy they were being continaully harassed by creditors and threatened with law suits. The schedules in bankruptcy filed with the petition listed the corporation's total liabilities at $198,561.93. Its total assets were listed at $54,466.

In the opinion of their attorney, appellants had no alternative but to declare bankruptcy.

As a result of the appellants' decision to file for bankruptcy, their employment was terminated. They applied for unemployment compensation benefits but were notified by the department on or about November 14, 1975, that they were ineligible. The appellants appealed but the initial determinations were affirmed by the department in separate decisions dated June 15, 1976. The department's decisions were affirmed by the judgment of the circuit court for Dane County on May 25, 1977, now under consideration here.

It is now contended that the department and circuit court erred in ruling that the appellants had voluntarily terminated their employment and that they had done so without cause.

The appellants are not unmindful of the substantial similarity between their claim and that rejected by this court in *Fish v. White Equipment Sales & Service, Inc.*, 64 Wis.2d 737, 221 N.W.2d 864 (1974). In that case we upheld a decision by the department denying unemployment compensation to a claimant who, as president and sole stockholder of his employer corporation, had decided to cease business operations because of adverse economic circumstances.

The factors influencing the decision of the claimant in that case to terminate the business were by no means insignificant. The reasons cited for the decision included prohibitory high interest rates rendering acquisition of new trucks and parts by the company, as well as credit purchases by customers, extremely difficult; strikes by truckers and by employees of the company's supplier which substantially reduced both the supply and the demand for new trucks; and the loss of the company's dealer franchise. In that case, no less than here, the

claimant appeared amply justified in his decision to terminate.

In determining whether an employee voluntarily terminated his employemnt, however, whatever justification he may have had for doing so is not relevant.[2] The initial question is not why the employee terminated his employment, but whether he in fact did so. The applicable test was set out by this court in *Dentici v. Industrial Comm.*, 264 Wis. 181, 186, 58 N.W.2d 717 (1953), and reaffirmed in *Fish v. White Equipment Sales & Service, Inc., supra,* 64 Wis.2d at 745, as follows:

" '. . . When an employee shows that he intends to leave his employment and indicates such intention by word or manner of action, or by conduct inconsistent with the continuation of the employee-employer relationship, it must be held, . . . that the employee intended and did leave his employment voluntarily. . . .' [Case cited.]"

Appellants here concede that they filed for bankruptcy which necessarily resulted in the loss of their employment, but argue that the decision to do so was involuntary, that they had no choice in the matter. As support for this contention they cite several dictionary definitions of the word "voluntary" and then set out the reasons compelling their decision.[3]

---

[2] Of course justification is relevant to the issue of whether or not the termination was for "good cause attributable to the employing unit" within the meaning of sec. 108.04(7)(b), Stats., and therefore an exception to the general exclusionary rule.

[3] Actually, the word "voluntary" does not even appear in the body of sec. 108.04(7)(a), Stats., but only in the title to that subsection. Under sec. 990.001(6), Stats., "[t]he titles to subchapters, sections, subsections and paragraphs of the statutes are not part of the statutes." Thus, it is initially arguable that the statute does not even require that the employment be "volun-

We need not reject appellants' definitions of that term in order to reject their conclusion that their termination of employment was not voluntary. Some of the definitions cited by appellants are taken from Webster's New Collegiate Dictionary. Several of these read as follows: " 'voluntary—1. Proceeding from the will, or from one's choice or full consent. 2. Unconstrained by interference; self-impelled; freely given, done, etc. 3. Done by design or intention; intentional; not accidental; as voluntary manslaughter. . . .' " None of these definitions convince us that appellants' filing for bankruptcy was not voluntary.

Their decision to file for bankruptcy did not spring from accident or impulse. It was the result of a deliberate process in which appellants sat down with their attorney and carefully considered their alternatives. After thoughtful analysis they arrived at the conclusion that bankruptcy was inevitable. They then decided to file a *voluntary* petition for bankruptcy. A decision reached in this manner is not involuntary. The fact that one particular alternative is recognized as by far the most reasonable course of action does not mean that one is not free to choose another. We therefore conclude that appellants voluntarily terminated their employment.

The appellants further contend, however, that even if the management decision to file for bankruptcy was voluntary, that decision cannot be attributed to them as employees absent some ground for disregarding the corporate fiction. Since no ground for doing so exists here,

tarily" terminated, but only that it be terminated by the employee. Since, however, the use of the word in the title to the statute must be viewed as at least manifesting legislative intent as to its meaning, and since also we have so construed it on prior occasions, *Dentici v. Industrial Comm., supra,* and *Fish v. White Equipment Sales & Service, Inc., supra,* we continue to do so here.

they argue, this case is clearly distinguishable from *Fish v. White Equipment Sales & Service, Inc., supra.*

The underlying premise to this argument is that a decision made by an individual while he is acting in his capacity as a director of a corporation cannot be attributed to him as a salaried employee of that corporation because a corporation is a distinct entity, separate and apart from its employees. In *Fish,* while not expressly so holding, we accepted this premise for purposes of analysis. We then went on in that case to find that the claimant's open admission that the corporation was in fact his alter ego served as a sufficient basis for piercing the corporate veil. In light of that admission we held that the decision to cease operations could be attributed to the claimant as an individual employee.

On the basis of our analysis in *Fish,* the appellants now claim that no finding that they voluntarily terminated their employment is possible absent the further finding that they were the alter ego of Prestige Furniture, Inc. Since there are no grounds for this latter finding, they contend, the ruling that they voluntarily terminated their employment is clearly erroneous.

Conceding, however, that our decision in the *Fish Case* may have incorrectly assumed the underlying premise to appellants' argument, we now emphatically reject the proposition that the corporate veil must be pierced before an employee who participates in a management decision to cease business operations can be found to have voluntarily terminated his employment. We see no inconsistency between the department's finding that appellants voluntarily terminated their employment by filing for bankruptcy on behalf of the corporation and the continued recognition of the corporate entity of Prestige Furniture, Inc.

The issue here is quite unlike that raised in the worker's compensation cases cited by appellants.[4] In those cases the question was whether an employee-employer relationship existed between a substantial stockholder of a corporation and the corporation itself such that the stockholder would be entitled to worker's compensation if he was injured while working for the corporation. No such question is raised here. The department is not claiming that appellants were not employees of the corporation. On the contrary, its decision denying them benefits because they voluntarily terminated their employment clearly assumes that they were in fact employed by the corporation.

The situation here is more analogous to one in which an officer or director of a corporation is alleged to have personally committed a tortious act. It is not now, nor has it ever been, the law in this state that such an individual escapes liability merely because he was acting in the capacity of a corporate director. The general rule is that the agent, as well as the principal for whom he is acting is responsible for the tortious acts of the agent. *Oxmans' Erwin Meat Co. v. Blacketer*, 86 Wis.2d 683, 692, 273 N.W.2d 285 (1979). In such situations the corporate shield protects only those who would otherwise be vicariously liable, not those whose own conduct is called into question. 1 Fletcher, Cyclopedia Corporations, sec. 33 (1974).

In this case it is their own conduct for which appellants are being held responsible, *i.e.*, their decision to

[4] *Leigh Aitchison, Inc. v. Industrial Comm.*, 188 Wis. 218, 205 N.W. 806 (1925); *Milwaukee Toy Co. v. Industrial Comm.*, 203 Wis. 493, 234 N.W. 748 (1931); *Columbia Casualty Co. v. Industrial Comm.*, 200 Wis. 8, 227 N.W. 292 (1929); *Continental Casualty v. Industrial Comm.*, 26 Wis.2d 470, 132 N.W.2d 584 (1965); *Fruit Boat Market v. Industrial Comm.*, 264 Wis. 304, 58 N.W.2d 689 (1953; and *Marlin Electric Co. v. Industrial Comm.*, 33 Wis.2d 651, 148 N.W.2d 74 (1967).

terminate the business. While that conduct is by no means tortious, it is conduct which would serve as a basis of recovery against the very party for whom appellants claim to have acted, if we were to accept their contention. Under such circumstances we think it unwise to ignore the fact of who actually acted on behalf of the corporation. Such an argument could just as well justify an individual's collecting benefits in his capacity as an employee after having fired himself without cause in his capacity as an officer of the corporation. While we certainly do not intend to infer that any such impropriety occurred here, we nevertheless think it important to note that such a conclusion could follow from appellants' position.

As an alternative ground for reversing the decision of the department, appellants argue that, assuming their decision to file a voluntary petition in bankruptcy does constitute the voluntary termination of their employment, such termination was for good cause within the meaning of sec. 108.04(7)(b), Stats. That section provides that an employee remains eligible for unemployment compensation even though he voluntarily terminates his employment if he does so "with good cause attributable to the employing unit."[5] In *Kessler v. Industrial Comm.*, 27 Wis.2d 398, 401, 134 N.W.2d 412 (1965), this court stated that the phrase "good cause attributable to the employer" means that:

". . . the resignation must be occasioned by 'some act or omission by the employer' constituting a cause which justifies the quitting. Good cause for quitting attributable to the employer as distinguished from discharge must involve some fault on his part and must be real and substantial."

[5] Specifically, sec. 108.04(7)(b), Stats., provides:

"(b) Paragraph (a) shall not apply if the department determines that the employe terminated his employment with good cause attributable to the employing unit."

█

In the case before us there is no contention that the decision to terminate the business was due to some fault on the part of the corporation. From the record here it appears Prestige Furniture Incorporated's misfortune resulted entirely from factors beyond its control. Moreover, in view of the fact that the appellants were in sole control of the business, any fault attributable to the employing unit would likewise have been attributable to them. For us to find a termination for cause under these circumstances would be to hold that an employee could create the very cause for which he is justified in quitting. We decline to do so.

It should also be noted that our decision in this case is consistent with the longstanding interpretation of the department on this issue. With few exceptions the department has consistently denied unemployment compensation to claimants who terminated their own employment by discontinuing the operation of an unprofitable business. This policy is fully consistent with the purpose of the Unemployment Compensation Act which ". . . is to stabilize employment and to minimize the loss of income when an employee involuntarily is out of work through the fault or misfortune of his employer." *Roberts v. Industrial Comm.*, 2 Wis.2d 399, 402–03, 86 N.W.2d 406 (1957). This act "was never intended to provide benefits to those individuals who become 'unemployed' by reason of the failure of their own business ventures." *Mednick v. Unemployment Compensation Board of Review*, 196 Pa. Super. 73, 75–76, 173 A.2d 665 (1961).

█

The appellants' contention that it is unfair to deny them unemployment compensation when the unemployment tax contributions made by the corporation were based on a payroll that included their salaries has been

rejected by this court in *International Union v. Industrial Comm.*, 248 Wis. 364, 21 N.W.2d 711 (1946), and *Maloney v. Industrial Comm.*, 242 Wis. 165, 7 N.W.2d 580, 9 N.W.2d 623 (1943). In those cases it was held that whether an employee is potentially eligible for benefits is immaterial in determining contributions or tax liability based on that employee's services. From this it follows that whether or not contributions were made on behalf of a particular employee is likewise immaterial to the potential eligibility of that employee. The two questions—whether an employee is to be included in the payroll that is to serve as the basis for computing the employer's contribution, and whether that employee is eligible for benefits—are separate and distinct.

Moreover, appellants exaggerate the effect of the department's interpretation of the statute when they claim that under that interpretation they could never recover benefits based on the contributions made by Prestige Furniture, Inc., on the basis of the salaries paid them during their employment there. As the department correctly points out, the "quit disqualification" imposed under sec. 108.04(7)(a), Stats., is only a suspension rather than a cancellation of benefits. The statute specifically provides that upon obtaining other employment within at least four weeks and earning wages of at least $200, the employee again becomes eligible for benefits chargeable to his former employer's account. Thus, appellants are not precluded from ever drawing benefits chargeable to Prestige Furniture Incorporated's account.

*By the Court.*—Judgment affirmed.