#25238, #25239-a-JKK

**2010 SD 19**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE CHARGE
OF SANDRA M. WILLIAMS,                     Appellant,

v.

SOUTH DAKOTA DEPARTMENT OF
AGRICULTURE,                               Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JOHN BROWN
Judge

* * * *

CASEY N. BRIDGMAN of
Bridgman and Adel
Wessington Springs, South Dakota          Attorneys for appellant.

ROBERT B. ANDERSON of
May, Adam, Gerdes and Thompson, LLP
Pierre, South Dakota                      Attorneys for appellee.

* * * *

CONSIDERED ON BRIEFS
ON JANUARY 13, 2010

OPINION FILED **02/24/10**

KONENKAMP, Justice

[¶1.]       This is a consolidated appeal by an employee who was discharged for unsatisfactory work performance.  Believing that she was fired in retaliation for making a complaint about sexual harassment, the employee brought a claim against her employer with the South Dakota Department of Labor, Division of Human Rights, and also filed a grievance with the Career Services Commission. Both agencies ruled against the employee, and the circuit court affirmed.  We also affirm.

## Background

[¶2.]       Sandra Williams began employment on September 9, 2004, as a secretary for the South Dakota Department of Agriculture.  On October 5, 2007, her employment was terminated for unsatisfactory work performance.  Williams filed a charge of discrimination against the Department of Agriculture with the South Dakota Division of Human Rights (Division).  She alleged that she was subjected to a sexually hostile work environment and that she was retaliated against by being discharged after complaining about it.  The Division conducted an independent investigation and accepted documentary evidence from Williams and the Department of Agriculture.  Thereafter the Division concluded that probable cause did not exist to support either claim and dismissed the charges.

[¶3.]       Williams also filed a grievance with the Career Services Commission (CSC).  She claimed that the Department of Agriculture did not have just cause to terminate her employment, but rather fired her in retaliation for making or reporting a sexual harassment claim.  The CSC held a hearing.  Williams, her

supervisors, and several coworkers testified.  After the hearing, the CSC issued a memorandum decision and findings of fact and conclusions of law ruling that the Department of Agriculture had good cause to end her employment for unsatisfactory work performance.

[¶4.]     Williams appealed both decisions to the circuit court.  The appeals were consolidated and a hearing was held.  The circuit court affirmed both rulings. Williams now appeals to this Court.  She asserts that the Division abused its discretion by performing a cursory investigation of her claims, issued clearly erroneous findings of fact, and erred when it concluded her employment was terminated for unsatisfactory performance.  Williams further claims that the CSC erred when it concluded that she was properly discharged for unsatisfactory work performance and that her employment was not affected by the sexual comments made.  We granted the Department of Agriculture's motion to consolidate the appeals.

### Standard of Review

[¶5.]     Contrary to both parties' contentions, we no longer review whether there was *substantial evidence* in the record to support the agencies' decisions.  That invalid standard was rectified more than ten years ago in *Sopko v. C&R Transfer Co., Inc.*, 1998 SD 8, ¶7, 575 NW2d 225, 228-29.  Rather, our standard of review is controlled by SDCL 1-26-36, requiring us to give great weight to the findings of the agency and reverse only when those findings are clearly erroneous in light of the entire record.  When the record before the agency consists entirely of documentary evidence, our review is de novo.  Vollmer v. Wal-Mart Store, Inc., 2007 SD 25, ¶12,

729 NW2d 377, 382 (citations omitted). Similarly, when the issue is a question of law, our review is de novo. *Id.* (citation omitted).

## Analysis and Decision

[¶6.]      Although the claims and evidence presented by Williams in both proceedings were substantially similar, the CSC held a hearing and accepted live testimony and the Division considered only documentary evidence. This distinction requires the application of different standards of review. *See Vollmer*, 2007 SD 25, ¶12, 729 NW2d at 382 (citations omitted). We give great weight to the findings of fact of an administrative body, except when evidence was presented in documentary form, which we review de novo. *Id.* Therefore, we address the administrative appeals separately.

## 1.  Division of Human Rights Appeal

[¶7.]      In her claim against the Department of Agriculture that she was subjected to a sexually hostile work environment and retaliated against by being discharged, Williams presented evidence that a co-employee, Darwin Kurtenbach, made multiple sexually-motivated remarks in July 2006 in her presence, although not directed at her. One such comment was from Kurtenbach to another employee, in which he said that the employee should put a "CH" after the "BIT" initials on her shirt. Williams also heard Kurtenbach say "secretaries do not do anything and that is why the pay is low" and "women are only good for one thing." She told a coworker, Tammy McGill-Bennett, that she was offended by the comments. Eventually, the fact Williams was offended traveled through the office to her supervisor, Kevin Fridley. According to Williams, after Fridley discussed the

incident with her, she was badgered daily and her work was increasingly scrutinized. Williams claimed that from October 2004 until July 2006 there were no complaints about her performance. As support, she offered an email from December 2005, in which she was informed by her supervisor, LaDonna Holm, that everything was good regarding her work performance.

[¶8.] The Department of Agriculture responded through written statements. These statements recounted the nature of the secretarial position Williams held and the history of her errors. The Department of Agriculture claimed that Williams was making mistakes shortly after being hired, but conceded that no documentary support existed proving that Williams was making errors in the first six months of her employment. Fridley explained, however, that because of how the database system was set up, errors sometimes would not be noticed until later. The Department of Agriculture further claimed that the learning curve for a secretary's position was approximately six to twelve months, and, after six months, Williams was still not performing at the level she should have been. Fridley and Holm attested that Williams was verbally informed of her performance deficiencies and continued to receive on-the-job training. Her progress remained slow and errors continued.

[¶9.] In October 2006, Williams was formally reviewed through a Performance Planning and Review, which review the Department of Agriculture submitted as evidence. The review indicated that Williams "[n]eeds to work on understanding the basic program. Has a tendency to forget what needs to be done when certain violations occur. . . . Needs to work on trying to remember program

functions or maybe write down what needs to be done for future reference. Will continue to work with [Williams] to maintain efficiency and accuracy in the dairy program." Ultimately, the Department of Agriculture concluded that her work performance did not sufficiently improve and terminated her employment in October 2007.

[¶10.] Whether Kurtenbach's "CH" and other comments were made in 2005 or 2006 became a pivotal issue. To prove that the comments were made in 2006, Williams relied on her recitation of the facts and her claim that Tammy McGill-Bennett could corroborate her version of the harassment. Moreover, Williams asserted that the event occurred in 2006 because Fridley sent her an email in September 2006, in which he wanted her to follow up on her reported harassment.[1] This email message asked Williams to identify the date the sexually inappropriate comments were made, and to whom, where, by whom, and what exactly was said. In Williams's email response, she stated that Kurtenbach made the "CH" comment and another comment regarding himself as God to two other employees in Williams's presence. She explained that she did not know when the statements were made. To support her retaliation claim, she later contended that the "CH" statement was made in July 2006, and if it had in fact been made in 2005, then why

---

1.      Tammy McGill-Bennett did not submit a statement to the Division, although the Division requested her to submit one. She did testify before the CSC, however, and in affirming the Division's order, the circuit court had before it McGill-Bennett's testimony. We too have the record of her testimony. We, therefore, will consider it in reviewing the Division's order. McGill-Bennett was asked when Darwin made the "CH" comment. She testified that she was unsure, but thought it could be 2006.

would Fridley have sent her an email in 2006 asking her to follow up on her recent claim of harassment.

[¶11.]     Fridley explained that his 2006 email to Williams was sent to address her recent complaints, which he did not realize included what was already addressed and what he believed he resolved in 2005. To support its assertion that the harassment was handled in 2005, the Department of Agriculture offered a copy of an email generated through the State's email system dated September 23, 2005, from Fridley to his superiors, Nick Roseland and Larry Gabriel. In the email, Fridley referred to a discussion he had with Kurtenbach on September 1, 2005. The email was sent in response to a coworker's claim that Williams told another coworker that she "had the goods on [Kurtenbach] for a sexual harassment case." Fridley averred that he conducted an informal investigation during which Williams indicated that she did not wish to take action because the comments were not made to her. Kurtenbach was counseled by Fridley about appropriate workplace behavior.

[¶12.]     The Division reviewed all the evidence submitted by Williams, the Department of Agriculture, and the information taken in its independent investigation. It concluded that the harassment occurred and was handled in 2005, and that Williams was properly discharged for unsatisfactory work performance, not in retaliation for complaining about Kurtenbach's sexually inappropriate comments. Williams now asserts several claims of error. She contends that the Division failed to conduct a reasonable investigation and that it should have held a hearing to determine whether probable cause existed.

[¶13.] The Division of Human Right's power to investigate alleged discriminatory actions by an employer against an employee is controlled by SDCL ch. 20-13. When presented with a charge by an employee, the Division may "receive, investigate, and pass upon charges alleging unfair or discriminatory practices." SDCL 20-13-28. "If the Division of Human Rights determines there is no probable cause to support the allegations of a charge after an investigation of the charge in accordance with § 20-13-28, the division shall issue an order dismissing the charge." SDCL 20-13-28.1. In its investigation, the Division may hold an evidentiary hearing. SDCL 20-13-32. There is, however, nothing to mandate a hearing. Since conducting a hearing was discretionary, we find no abuse of discretion in the manner the Division investigated Williams's charges.

[¶14.] Williams next claims that the Division's findings of fact were clearly erroneous. As we earlier indicated, because the Division based its decision solely on documentary evidence, our review is de novo. Williams alleges two types of discriminatory conduct. She asserts (1) that she was subjected to a sexually hostile work environment and (2) that she was retaliated against by being discharged. To prove that she was subjected to a sexually hostile work environment, Williams must establish that

> (1) she belongs to a protected group, (2) she was subject to unwelcome sexual harassment, (3) the harassment was based on sex, (4) the harassment affected a 'term, condition or privilege' of employment, and (5) the employer knew or should have known of the harassment in question and failed to take proper remedial action.

*See* Huck v. McCain Foods, 479 NW2d 167, 170 (SD 1991) (citation omitted). To prevail on a claim of retaliation, Williams must establish that she (1) engaged in a

statutorily protected activity, (2) the employer took adverse action against her, and (3) there is a causal connection between the protected activity and adverse action. *See* Coleman-Santucci v. Sec, US Dept. of Health and Human Serv., 754 FSupp 209, 216 (DDC 1991) (citation omitted).

[¶15.]	Considering the elements essential to her claims, Williams must first establish that there was probable cause to show that she was discriminated against.[2] *See* SDCL 20-13-1.1. Probable cause is defined as:

> a determination that it is more likely than not that the charging party and members of a class, or both, were discriminated against based on a violation of this chapter. The likelihood that discrimination occurred is assessed based upon evidence that establishes a prima facie case, and if the respondent has provided a viable defense, whether there is evidence of pretext.

SDCL 20-13-1.1. Using this definition, we first decide whether Williams established a prima facie case. If she satisfied that low threshold, then we examine whether the Department of Agriculture provided a viable defense. If a viable defense was presented, we then determine whether there was evidence of pretext.

[¶16.]	Williams clearly established a prima facie case for a sexually hostile work environment. She belongs to a protected group. Kurtenbach's comments were unwelcome sexual harassment, based on sex. Her employer knew of the comments, and viewing only Williams's evidence, the employer failed to take proper remedial action. Finally, Williams's evidence established that the sexually inappropriate

---

2.	Contrary to the assertion made by Williams, we do not review whether probable cause existed based on the definition in *Erdahl v. Groff,* 1998 SD 28, ¶16, 576 NW2d 15, 18. A different definition for probable cause was applied in *Erdahl* because SDCL 20-13-1.1 had not been enacted at the time of the case. *See id.* ¶¶17-21.

comments were made in 2006, after which her supervisors began to more closely scrutinize her work, placed her on a work improvement plan, and in October 2007, discharged her. Williams also established a prima facie case for retaliatory discharge. Reviewing only her evidence, she complained about sexual harassment, her employer terminated her employment, and the termination occurred after she complained about the harassment.

[¶17.]    A prima facie case existing, we then decide whether the Department of Agriculture provided evidence of a viable defense, and if so, whether there was evidence of pretext. *See* SDCL 20-13-1.1. We first review the evidence related to whether Williams was subjected to a sexually hostile work environment. Lori Butler, an employee who Kurtenbach called "peaches," said she was not offended by Kurtenbach's comments. Delphine Vavra, another coworker, stated that she observed no conduct she believed would rise to the level of sexual harassment and that Kurtenbach's behavior toward Williams and other female employees was unremarkable. The Department of Agriculture does not dispute that Kurtenbach made inappropriate comments at work, but argues that because the issue was investigated, resolved, and ceased to exist, the work environment was not hostile.

[¶18.]    Although it was undisputed that Kurtenbach made the "CH" comment, as well as calling Butler "peaches," and that the Department of Agriculture was aware of Kurtenbach's behavior, there was insufficient evidence to show that it was more likely than not the comments had "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment." *See Huck*, 479 NW2d at 169-70 (quoting

Meritor Savings Bank, FSB v. Vinson, 477 US 57, 65, 106 SCt 2399, 2404-05, 91 LEd2d 49, 58-59 (1986)).  Whether the conduct created a sexually hostile work environment depends on whether that environment "would reasonably be perceived, and is perceived, as hostile or abusive[.]"  *See* Harris v. Forklift Systems, Inc., 510 US 17, 22, 114 SCt 367, 371, 126 LEd2d 295 (1993).  Here, there was evidence that the Department of Agriculture investigated Williams's claims, counseled Kurtenbach, and the behavior stopped.  Moreover, two coworkers submitted statements that no such sexually inappropriate comments were observed or noticed.  We find no error in the Division's conclusion that probable cause did not exist to support this charge.

[¶19.]      We next review the evidence related to Williams's retaliatory discharge claim.  The crux of this issue depends on when the comments by Kurtenbach were made.  A successful retaliatory discharge claim requires a nexus between the protected activity and the adverse employment action.  If the comments were made in 2005, and no other such sexually inappropriate behavior occurred, then there was an insufficient nexus between the time Williams complained about sexual harassment and the adverse action taken against her in 2007.  If, however, the comment was made in 2006, there was a heightened likelihood of probable cause to support Williams's complaint of retaliatory discharge.

[¶20.]      To prove the comments were made in July 2006, Williams placed considerable weight on Tammy McGill-Bennett's testimony and an email sent by Fridley in September 2006.  But a review of McGill-Bennett's testimony does not establish conclusive corroboration.  She was asked, "Okay, what time period, month

and year, if you can remember, did this take place?" She replied, "It was a long time ago. I think back in '06, at the end of the year." Counsel for Williams then asked, "Would 2006 sound about right?" McGill-Bennett answered, "Yeah." Moreover, after reviewing the email sent by Fridley, the context is not as clear as Williams contends. Fridley did not specifically refer to the "CH" comment, but instead inquired about what complaints Williams was making, asking for her to be more specific by identifying the month and day. In her response, Williams could not identify the date of the "CH" comment. Fridley's statement to the Division explains that the context of the email was to determine what new complaints Williams had, not to rehash the 2005 issues, which he believed had been resolved.

[¶21.] We find more persuasive the evidence presented by the Department of Agriculture. The email from Fridley to Nick Roseland and Larry Gabriel, dated September 23, 2005, sets forth in detail Fridley's handling of the "CH" comment by Kurtenbach. In particular, the email outlines Fridley's investigation into the claim that "Williams had the goods on [Kurtenbach] for a sexual harassment case." The email states,

> 9/1 at approximately 10:15 am I met with Nick in his office. Nick informed me that I needed to talk to the people that heard Sandy make these statements. 9/1 approximately 10:35 am I talked with Scott. He said he and Deanne Booth were talking at the counter by Sandy's work area. Deanne was helping Scott with some computer things. Deanne was giving Scott a hard time about his computer abilities and Scott jokingly said to Deanne watch it I am old and do not give me a hard time about my computer skills or I will file a harassment claim against you. Sandy heard this conversation and said that [Kurtenbach] had better treat her as an equal. Scott then left the area. Deanne continues to talk with Sandy.

On 9/8 approximately 2:30 pm I discussed the situation with Deanne the conversation Sandy and Deanne had. Deanne said that Sandy was Mad and she thinks that [Kurtenbach] says things that classify as Sexual harassment. Deanne told Sandy she should talk to [Kurtenbach]. When Deanne asked Sandy if she had any documentation, Sandy said no. Sandy told Deanne that she had gotten someone fired in the past for sexual harassment.

On 9/8 approximately 2:30 pm I discussed the situation with Sandy Williams. Comment Made by [Kurtenbach] concerned her. They are comments about Secretary's do not doing anything and why the pay is so Low. Women are good for only one thing. [Kurtenbach] made a comment to Deanne about her shirt that had BIT on it, just add CH to that. This comment was heard by Sandy and she found it offensive. Comments about [Kurtenbach's] wife. Sandy does not want to pursue Sexual harassment unless comments are said directly to her. Not to that point now. She can not see how others take some of the comments said by [Kurtenbach]. Sandy said she is a proud person and people should not degrade her. She is considering other employment. I talked briefly about comments she makes about [Kurtenbach] if found not to be true, he has rights against her.

On 9/12 approximately 9:15 am I reviewed with Nick what had taken place. Nick told me that I need to warn [Kurtenbach] not to make comments that others may find offensive, even if he is only joking around. I will follow up with Nick.

On 9/12 approximately 3:45 pm I reviewed with [Kurtenbach] comment and concerns Sandy Williams has. [Kurtenbach] say he did not say women are only good for one thing. He said that Man is on the downhill slide since Adam gave up a rib. Other statements were maybe made but not directly to Sandy and always in a joking manner. I warned [Kurtenbach] to not make comments that others may find offensive.

I have reviewed and notified all people involved and find no wrong doings at this time.

[¶22.] Considering this email message, we conclude that Williams first complained about the "CH" comment and Kurtenbach's sexually inappropriate behavior in 2005. We further conclude that no adverse employment action was

taken against Williams until January 2007, when she was placed on a work improvement plan. In view of the date of the first complaint and that no new sexually inappropriate comments or behavior were shown thereafter, there was insufficient evidence of a nexus between the protected activity and adverse employment action. The Division's finding of no probable cause is affirmed.

## 2. Career Services Commission Appeal

[¶23.] Williams filed a grievance with the CSC. She claimed that the Department of Agriculture did not have just cause to terminate her employment, but rather fired her in retaliation for complaining about sexually inappropriate comments made by a coworker. A hearing was held on April 17, 2008, in which Fridley, Holm, and Williams testified. Other witnesses included Lynne Valenti from the Bureau of Personnel, Karen Webber-Boyer, Tammy McGill-Bennett, Marjorie Gregg, and three of Williams's coworkers. In addition to the live testimony, the CSC accepted documentary evidence. On July 17, 2008, the CSC issued a memorandum decision finding that the Department of Agriculture had just cause to fire Williams. The CSC recognized that inappropriate comments were made in the workplace, but noted that "such crudeness does not eliminate the need for accuracy and reliability." Findings of fact and conclusions of law were issued on September 5, 2008.

[¶24.] Williams claims that the CSC's findings of fact were clearly erroneous. She further contends that the CSC erred when it concluded that Kurtenbach's comments did not affect her employment and that she was discharged for unsatisfactory work performance. The Department of Agriculture, on the other

hand, claims that there was "substantial evidence" in the record to support the CSC's decision.  As mentioned earlier, we no longer apply the "substantial evidence" test in reviewing agency decisions.  *See Sopko*, 1998 SD 8, ¶7, 575 NW2d at 228-29.  SDCL 1-26-36 requires us to give great weight to the factual findings of the agency and only reverse if such findings were clearly erroneous in light of the entire record.  Here, the CSC heard live testimony.

[¶25.]	The CSC has the power to "act as [a] grievance review board for career service employees[.]"  SDCL 3-6A-37.  In doing so, the CSC may hold an evidentiary hearing and pass on whether there was legally sufficient evidence to support the claimed grievance.  SDCL 3-6A-38.  "In resolving grievances involving the discipline of an employee, the career service commission shall determine and decide whether the action was made for good cause."  SDCL 3-6A-38.1.

[¶26.]	From our review of the testimony and documentary evidence, the CSC's findings of fact were not clearly erroneous and it did not err when it concluded that there was just cause to support Williams's termination.  Fridley and Holm testified that errors were noticed in Williams's work at the end of her six-month probationary period and that Williams was informed of these errors.  She continued to receive on-the-job training, but to Fridley and Holm her progress remained slow and errors continued to be noticed beyond what they considered acceptable in the learning period.  Fridley also testified concerning a Performance Planning and Review prepared for Williams on October 20, 2006, and the review was offered as evidence.  It mentioned concerns regarding Williams's knowledge of the job, her need for improvement, and noted that she had trouble understanding

basic program knowledge. Because her work performance did not improve after the review, Williams was placed on a work improvement plan in January 2007. As a result of this plan, Fridley met with Williams weekly and discussed ways she could improve her work. At the conclusion of the plan's duration, Fridley and the Department of Agriculture were not satisfied with Williams's performance and advised her in writing that disciplinary action could be taken. Ultimately, her employment was terminated based on unsatisfactory work performance.

[¶27.]     Williams does not claim her work was error free. Rather, she maintains that Fridley and Holm only scrutinized her work to set her up for termination after she complained of certain sexually inappropriate comments made by Kurtenbach. Similar to her complaints to the Division, Williams argued to the CSC that Kurtenbach's comments were made in July 2006, and the retaliatory actions of the Department of Agriculture began shortly thereafter. But these comments were actually made in 2005. Thus, we find no error in the CSC's ruling that Williams was not retaliated against by being discharged after she complained about Kurtenbach's comments. The evidence supports the CSC's findings that her employment was terminated for unsatisfactory work performance.

[¶28.]     Affirmed.

[¶29.]     GILBERTSON, Chief Justice, and MEIERHENRY, and SEVERSON, Justices, and KERN, Circuit Judge, concur.

[¶30.]     KERN, Circuit Judge, sitting for ZINTER, Justice, disqualified.